ORIN M. SKINNER v. STATE.

[FILED FEBRUARY 19, 1890.]

1. **Rape:** ASSAULT TO COMMIT : WHAT CONSTITUTES. To warrant
a conviction for an assault with intent to commit a rape, the evi-
dence must show, beyond a reasonable doubt, that the accused
not only intended to have sexual intercourse with the prosecu-
trix, but that he intended to use whatever force might be nec-
essary to overcome her resistance and accomplish his object.

2. ——— : ——— : EVIDENCE. *Held,* That the verdict is not sus-
tained by the evidence.

ERROR to the district court for Dundy county. Tried
below before COCHRAN, J.

*J. W. McClelland,* and *May & McElroy,* for plaintiff in
error.

*William Leese, Attorney General,* for the state.

NORVAL, J.

At the January term, 1889, of the district court for
Dundy county an information was filed charging the
plaintiff in error with making an assault upon one Rhoda
A. Rogers, with the intent of committing upon her the
crime of rape. He was convicted and sentenced to impris-
onment in the penitentiary for two years. The defendant's
motion for a new trial was overruled and an exception was
entered on the record, and he now brings the cause to this
court for review by proceedings in error.

Several errors are assigned, but one of which will be
considered, and that is, that the verdict of the jury is not
sustained by sufficient evidence.

It appears from the evidence that the prosecutrix, with
her husband and family, resided in the rear rooms of a

store building situated in the village of Alstine; that the residence portion was separated from the storeroom by a partition, through which there was door or passage-way from the residence portion to the store, and which, just previous to the time the alleged assault was made, was open.   It also appears that prior to the alleged occurrence the families of the prosecutrix and the defendant were on friendly terms; that the defendant had boarded in the prosecutrix's family at one time; had assisted her in the store, and that the two were frequently seen engaged in friendly conversation, with her head upon his breast.   At the time of the alleged assault the store was kept by one J. P. Smith, and in which Mr. Smith was at the time. The husband, Mr. Rogers, had gone into the country on that day, which fact was known to the accused.   The plaintiff in error, on the day in question, went into the store where Mr. Smith was, and passed on into the room occupied by the prosecutrix and her children.   We quote the testimony of Mrs. Rogers, giving in detail what occurred in her room:

Q. Did you see the defendant on the 28th day of December, 1888?

A. I did.

Q. Where did you see him?

A. He came to my house.

Q. Where was you at the time he came to your house?

A. I was in the kitchen at work.

Q. About what time of day was this?

A. It was in the morning early he came first.

Q. What time—he came during the day again?

A. Yes, sir; he came there about four times between 8 o'clock that morning and 10.

Q. Was any one with him?

A. No, sir.

Q. Who was with you at these times on the 28th day of December that he came there?

A. There weren't any one in the room with me but my children, but Mr. Smith was there in the store building.

Q. Was any one in the kitchen with you?

A. No, sir. * * *

Q. What did Mr. Skinner do and say to you when he came there first in the morning?

A. Well, he came that morning and spoke and said "Good morning" to me; then he sat down by the stove and he asked me when we were going away (we were talking about leaving); I said I didn't know when we were going, and then he began to inquire about a letter that we had got on the Monday before; and he asked me what it was and who wrote the letter; I told him I didn't know; and he wanted to know what was in the letter; I said I didn't know, and I would tell him what was in the letter; and he wanted to know what he was going to do about it; I said he wasn't going to do nothing; he says "Is he going to leave you?"

Q. Who did he refer to when he asked you what he was going to do about it?

A. He wanted to know what Mr. Rogers was going to do about it—what he was going to do about the letter; that was the matter.

Q. Go on and state what was said.

A. He says, "Is he going to leave you?" Said I, "No." He says, "Won't you go with me?" I says, "No, I would not."

Q. Mrs. Rogers, I wish you to narrate now what took place—what Mr. Skinner said to you when he first came in there in the morning of the 28th day of December?

A. When he asked me to go with him I said, "No, I would not; I have a man of my own; I told him to leave, and he went home, and he was not gone home but a few minutes until he came back in the storeroom. I was in there sewing, and he wanted to know where Will was—if he had come back. Says I, "No; he is not home yet."

I says, " I want you to leave me." He made no reply but just stood there. Then he turned around and went out and got on his pony. I went in the kitchen to work again. He rode around to the kitchen door, I had the door open; he rode up to the door and he says to me, " When will Rogers want that table?" I knew what he wanted; I turned around and left him standing there, and he rode away and I didn't see him any more until dinner.  *  *  *

Q. Now, when did you see the defendant again that day, on the 28th day of December?

A. I saw him go over the hills and he was gone about two hours and a half or three hours and then he came back at about half past three—just about that time—as near as I can tell; he rode up to Mr. Towles's store and tied his pony to the hitching post, and got off and came over to our place.

Q. Where was you at that time, when he came over the last time?

A. I was in the kitchen.

Q. Did he come to your door?

A. Yes, sir; he did.

Q. Tell what he said to you this time.

A. And he came into the store first and got some medicine, and then he came from the storeroom into the kitchen; as he came in he closed the door after him, and as soon as I could get to the door I opened the door, and I told him if he would please just leave the door open, and then he flew back and says, " Can't I talk to you with the kitchen door shut?"

Q. State briefly what was said there.

A. Then he came up to me and wanted to have intercourse with me, and I told him " No."

Q. Now, Mrs. Rogers, give the exact words that Mr. Skinner used to you at that time; just what he said.

A. Well, he says, " Won't you let me have it?" Said I, " No, I will not."

52

Q. When he said this, where did he stand from you; how far?

A. He stood just in front of me, just as close as he could possibly get.

Q. Explain what he did to you.

A. When I told him " No," he took hold of my arms and forced me against the wall and said he must have it. I told him " No." Said I, " If you don't let loose of me I'll hollow." He says, " If you do, we'll both die right here together." He shoved his hand back where I seen a revolver sticking out of his pocket. He said, " Besides, if you tell it, he'll die too." He meant Mr. Rogers.

Q. Just go on and state what took place.

A. He says, " If he opens his head to me I'll drop him before he has a chance to do anything at all."

Q. Did he say anything about officers?

A. Yes, sir.

Q. What did he say?

A. He says, besides, " The officers can never take me." He says, " I have already killed three in my time and I am good for that many more." And when I told him I would hollow, he says, " If you do and they come out here I'll shoot them down."

Q. Go on and state what he then did and what you did.

A. *Well, when I told him I would hollow if he didn't let loose of me, he let loose of me then,* and I had been ironing, and I picked up the clothes and ran out of there and went around the house and ran into the wareroom and staid there until I thought he would be gone; then I went into the store building; he had gone; I told Mr. Smith what had happened and he said, " Yes," he had heard it; and he had gone home then. He hadn't been home but just a few minutes, when he came carrying some things over that he had borrowed of us. He comes to the door and I didn't want to go to the door; he asked me to make up; I told him "No, I didn't want to," but I went to the door

Skinner v. State.

and he paid me for a jar that he had broken and worn out; then he went home again, and I was in the kitchen working and he came into the store again, and he came to my door and wanted me not to say anything about this; he says, " Let us make up friends and not make any trouble."

Q. Has the defendant made any attempts to assault you prior to the 28th day of December, 1888 ?

A. He did.

Q. When was that?

A. It was about four or six weeks before this.

Q. Now just state the circumstances of that assault, where he was and so on.

A. Well, it was in the same place.   I was in the kitchen at work and he came in and said he wanted to talk to me; as we had always been friendly before; he talked a little while and then he made his proposals to me what he had come for.

Q. What did he say ?

A. He said he wanted me to let him have " one "; that is just the words he used.

Q. What did you tell him?

A. I told him " No, I would not."

Q. What did he do ?

A. I told him I would die right there before I would do such a thing as that.   I said I would tell his wife; and he says, " Why you can't make her believe it if you do tell it to her."   He says, " I can make her believe anything."

Q. Was there anything else said or done about the matter at that time ?

A. Yes, sir ; and he again asked me, and I told him " No," and he took hold of me at that time and tried to coax me to; I told him, " I would not, that I would die right there;" I told him to go; when he made the threats I told him if he didn't go I would call for help; there were some young men on the front steps talking ; I told him I

would call these young men in if he didn't go ; he said if I did he would drop them right in the floor.   *   *   *

Q. Now, then, the last time you have just spoken of, when did that occur ?

A. It was about the 15th of November.

Q. About what time in the day ?

A. It was in the morning, about 10 o'clock.

Cross-examination :

*       *       *       *       *       *       *       *       *       *

Q. What prevented him on the 15th day of November in succeeding when he asked you about it? What prevented him from overpowering you?

A. I told him if he didn't leave I was going to call these young men in.

Q. You think it was that that prevented him from succeeding?

A. Yes, sir ; I do.

Q. Did he attempt to disturb your clothes in any way ?

A. No more than taking hold of me.

The prosecutrix testified further on cross-examination that she was twenty-four years old at that time; that Mr. Smith and two other men were in the storeroom at the time of the occurrence on December 28 ; that the defendant did not attempt to disturb her clothing ; that when she told the defendant if he did not let go of her she would halloo, he let loose; that the prosecutrix had never told her husband or any one else of the first alleged assault until after December 28 ; that on a Sunday in December, after the first and prior to the last alleged assault, the prosecutrix and her husband went home with the defendant and his wife, took dinner, and spent part of the day with them, and that the defendant stopped over night at the prosecutrix's on the 27th day of November, a few days after the first alleged assault.

J. F. Smith testified that the defendant went into the room of the prosecutrix through the store on December

28 ; that he heard some noise and some talking, which was not· very loud.

We have given substantially all the testimony contained in the bill of exceptions in regard to the assault.  Is it sufficient to support the verdict?  We think not.

In the case of *Garrison v. People,* 6 Neb., 274, it was held that " To constitute an assault with intent to commit a rape there must have been an intent to commit a rape, and that intent must have been manifested by an assault for that purpose upon the person intended to be ravished.  Both of these ingredients are necessary to constitute the offense."  It was undoubtedly the defendant's desire to have sexual intercourse with the prosecutrix.  The evidence fails to show that he intended to compel her to submit to his desires by force, but the entire circumstances established that he expected to accomplish his purpose by procuring her consent, and failing in that he desisted.  The place and time of day when the act was committed, the previous acts of the parties, the fact that her clothes were not disturbed, that there was no indication of violence on her person, and that the defendant ceased urging his solicitations when the prosecutrix threatened to make an outcry, indicate that the defendant did not intend to commit a rape.  He must have intended to use whatever force was necessary to overcome her· resistance and compel her to submit to his passions, to make out the crime of an assault with intent to commit rape.

The evidence fails to sustain the verdict.

The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

THE other judges concur.